NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-42                                      Appeals Court

THE GILLETTE COMPANY  vs.  CRAIG PROVOST & others.[1]

No. 16-P-42.

Suffolk.     October 13, 2016. - March 7, 2017.

Present:  Wolohojian, Carhart, & Shin, JJ.


"Anti-SLAPP" Statute.  Privileged Communication.  Practice,
     Civil, Motion to dismiss, Interlocutory appeal.



     Civil action commenced in the Superior Court Department on
January 16, 2015.

     A special motion to dismiss was heard by Janet L. Sanders,
J.


     Christopher Morrison for the plaintiff.
     Brian C. Swanson, of Illinois, for the defendants.


     SHIN, J.  The Gillette Company sued four of its former

employees (the individual defendants), claiming that they

misappropriated Gillette's trade secrets and other confidential

information to develop a wet-shaving razor for the benefit of

---

     [1] John Griffin, William Tucker, Douglas Kohring, and
ShaveLogic, Inc.

their new employer, the defendant ShaveLogic, Inc.  After

ShaveLogic counterclaimed, alleging that Gillette brought its

lawsuit in bad faith, Gillette moved to dismiss the

counterclaims on grounds that the filing of the lawsuit was

petitioning activity protected by G. L. c. 231, § 59H (commonly

known as the anti-SLAPP[2] statute), and was protected by the

litigation privilege.  A judge of the Superior Court denied the

motion, and Gillette filed this interlocutory appeal.

We conclude that, based on the record before her, the judge

could have found that ShaveLogic met its burden of showing that

Gillette's petitioning activity was "devoid of any reasonable

factual support" and caused ShaveLogic "actual injury."  Under

the anti-SLAPP statute, that showing was sufficient to allow the

counterclaims to go forward.  We further conclude that the

litigation privilege does not bar the counterclaims because they

seek to hold Gillette liable not for speech, but for conduct

(its act of filing an allegedly groundless lawsuit), to which

the privilege does not apply.  We therefore affirm that part of

the judge's order resolving these two issues in ShaveLogic's

favor.[3]

---

[2] The acronym "SLAPP" stands for strategic lawsuit against public participation.  Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 160 n.7 (1998).

[3] The judge also rejected Gillette's argument that the counterclaims lacked sufficient factual allegations to state a

Background.  We summarize the allegations made by each party, reserving other facts as they become relevant to our analysis of the issues raised.

1.  Gillette's claims.  The complaint alleges the following facts:  Gillette is in the business of "designing, manufacturing, and marketing razors and other shaving products." As a leader in this field, Gillette holds "thousands of patents covering razors and other shaving technology."  It is also "constantly researching and designing new technology and advancing current technology" and "has taken affirmative steps to protect the confidentiality of" information related to those efforts.

Each of the individual defendants once worked for Gillette in positions that gave them access to Gillette's confidential information and trade secrets, including confidential information "relating to magnetic attachments for shaving cartridges and elastomeric pivots."[4]  In addition, at least one of the individual defendants, while at Gillette, "produced and/or otherwise worked on sketches and/or prototypes with

---

claim upon which relief can be granted.  That portion of the decision is not before us because it is not open to interlocutory appeal.

[4] According to the defendants, "[a]n elastomer is essentially a soft plastic, with resilience that is similar to rubber."

respect to several magnetic attachment and elastomeric pivot concepts."  Upon their respective separations from Gillette, the individual defendants agreed that they would not use Gillette's confidential information or share it with any non-Gillette employee or entity.  They also agreed "to disclose and assign to Gillette any invention, idea, or improvement made or conceived during their employment at Gillette."

ShaveLogic is one of Gillette's competitors "in the wet shaving field."  At some point after the individual defendants left Gillette, ShaveLogic hired them as employees or retained them as consultants.  Thereafter, ShaveLogic filed several patent applications relating to the use of magnetic attachments and elastomeric pivots in razors.  One of those applications, which was directed to a magnetic attachment for a shaving cartridge, became U.S. Patent No. 8,789,282 (the '282 patent).  ShaveLogic is the owner of the '282 patent, and two of the individual defendants are named inventors.

Based on these allegations, the complaint asserts that the individual defendants "used Gillette confidential information and trade secrets to design, invent, and/or otherwise contribute to the technology covered by the '282 patent and the [p]atent [a]pplications, including but not limited to magnetic attachment and elastomeric pivot concepts."  Against the individual defendants, the complaint raises claims for breach of contract,

misappropriation of trade secrets, and unfair and deceptive acts and practices in violation of G. L. c. 93A.  Against ShaveLogic, the complaint asserts one count seeking to impose a constructive trust on the '282 patent and the patent applications.[5]

2.  ShaveLogic's counterclaims.  The counterclaims allege the following facts:  ShaveLogic is a start-up company, which is trying to compete in the wet-shaving market dominated by Gillette.  Although Gillette currently holds "over [four] times the market share held by the nearest competitor," its market dominance is being threatened by "new competition from dynamic start-up companies" such as ShaveLogic.  In response Gillette has "tak[en] steps to attempt to thwart newer companies" from entering the market.

In May of 2014, Gillette began sending ShaveLogic letters "containing threats of litigation."  Gillette sent the letters with the knowledge that ShaveLogic would have to disclose them to its potential investors and marketing and distribution partners.  According to ShaveLogic, the letters and the ultimate filing of this lawsuit had their intended effect:  ShaveLogic has lost potential investors, and, in November of 2014, a

_____

[5] Gillette has since amended its complaint to include additional claims and factual allegations.  It has also stipulated to the dismissal of its trade secret claim against the individual defendants.  As the parties agree, because the original complaint was the pleading before the motion judge, it is likewise the operative pleading for purposes of our review.

marketing and distribution company withdrew from negotiations with ShaveLogic that had been ongoing for most of that year. Had the negotiations continued, they "would likely have led to a contract for distribution of ShaveLogic razors."

ShaveLogic characterizes this lawsuit as nothing more than "an anti-competitive effort" by Gillette "to harass and to prevent ShaveLogic from becoming a competitor in the wet shaving market." It asserts two counterclaims, the first for intentional interference with advantageous business relationships, and the second for unfair and deceptive acts and practices in violation of G. L. c. 93A.

3. Gillette's motion to dismiss. Gillette filed a motion to dismiss the counterclaims directly under the anti-SLAPP statute, G. L. c. 231 § 59H, and under Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974), predicated in part on the litigation privilege. To counter Gillette's arguments under the anti-SLAPP statute, ShaveLogic submitted six declarations, including one from each of the four individual defendants and one from its chief executive officer, Rob Wilson. Gillette submitted one declaration in response, from its legal counsel, John M. Lipchitz.

After considering these materials and conducting a nonevidentiary hearing, the judge issued a memorandum of decision and order denying the motion to dismiss and ruling that

the counterclaims could go forward to discovery. Gillette filed a timely notice of this interlocutory appeal.

Discussion. 1. Anti-SLAPP statute. General Laws c. 231, § 59H, inserted by St. 1994, c. 283, § 1, provides that "[i]n any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss." When deciding such a motion, the judge "shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based." Ibid. See Van Liew v. Stansfield, 474 Mass. 31, 36 (2016). If the judge denies the motion, the moving party may immediately appeal under the doctrine of present execution. See Fabre v. Walton, 436 Mass. 517, 521-522 (2002). Our review on appeal is limited to determining whether the judge committed an abuse of discretion or other error of law. See Baker v. Parsons, 434 Mass. 543, 550 (2001); Burley v. Comets Community Youth Center, Inc., 75 Mass. App. Ct. 818, 821 (2009).

A two-part test governs special motions to dismiss under G. L. c. 231, § 59H. First, the moving party must "make a threshold showing through the pleadings and affidavits that the claims against it are 'based on' . . . . petitioning activities

alone and have no substantial basis other than or in addition to the petitioning activities." Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167-168 (1998). Here, ShaveLogic conceded that its counterclaims are "based on" petitioning activity by Gillette, namely, its act of filing this lawsuit. See G. L. c. 231, § 59H (petitioning activities include "any written or oral statement made before or submitted to a . . . judicial body" or "made in connection with an issue under consideration or review by a . . . judicial body"); Van Liew, 474 Mass. at 36 (application for harassment prevention order qualified as petitioning activity under anti-SLAPP statute).[6] The focus of our inquiry is therefore on the second part of the test, which shifts the burden to the nonmoving party to prove "by a preponderance of the evidence" that the petitioning activities at issue were "devoid of any reasonable factual support or any arguable basis in law" and caused the nonmoving party "actual injury." Van Liew, 474 Mass. at 36, quoting from G. L. c. 231

---

[6] Although the parties agree that Gillette's complaint qualified as petitioning activity, we note that in Duracraft the court expressed doubt that "the [anti-SLAPP] statute was intended to reach suits such as this one between two corporate competitors involved in other ongoing litigation, where the special motion may have been deployed not to limit 'strategic litigation,' but as an additional litigation tactic." 427 Mass. at 163. See id. at 161 ("The typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects").

§ 59H.  See Baker, 434 Mass. at 553-554.  The motion judge did not abuse her discretion in concluding that ShaveLogic satisfied both of these requirements.

With respect to the first requirement, the judge could have found by a preponderance of the evidence that Gillette's complaint was "devoid of any reasonable factual support."  As the judge observed, ShaveLogic's burden on this issue was a high one:  it had to demonstrate that "no reasonable person could conclude" that there was a factual basis to support Gillette's claims.  Baker, 434 Mass. at 555 n.20 (quotation omitted).  Even so, ShaveLogic submitted enough evidence to permit the judge to find that it met that burden.

ShaveLogic's evidence showed that the general concept of using magnetic attachments in razors was in the public domain as early as 1919, and certainly before any of the individual defendants started working at ShaveLogic.  Likewise, ShaveLogic offered evidence showing that the general concept of using elastomeric pivots in razors was publicly known before the individual defendants joined ShaveLogic.  Indeed, at the hearing on its motion to dismiss, Gillette admitted that these general concepts are not trade secrets or protectable intellectual property.

ShaveLogic also submitted detailed declarations from the individual defendants themselves, all of whom denied working on

any projects at Gillette involving magnetic attachments or elastomeric returns[7] like those conceived and developed at ShaveLogic years later.  They further denied using any Gillette confidential information in developing ShaveLogic's product.  Their statements were corroborated by Wilson, who averred in his declaration that he came up with the idea for the ShaveLogic product in 2009, over a year before he met and hired the individual defendants.  In support of that assertion, Wilson included examples of computer automated design drawings of his invention, which he said were created in April of 2010.  Only then did he seek out people with experience designing and developing shaving products, and it was not until early 2011 that he met any of the individual defendants.

To counter ShaveLogic's evidentiary proffer, Gillette submitted a single declaration, as noted above, from its legal counsel, Lipchitz.  In sum and substance, Lipchitz's declaration asserts that Gillette sent its prelitigation letters and filed this lawsuit for a legitimate, good-faith purpose:  "to protect

---

[7] According to the individual defendants who are named inventors on the '282 patent, the razor they designed for ShaveLogic uses an elastomer only in the "return force," which is needed to return the blade to a neutral position when it is not in contact with the user's skin.  Their design does not use elastomeric pivots; instead, it uses rigid, nonelastomeric "fingers" and "receiving bores" for the pivot.

[Gillette's] intellectual property rights and its substantial investment in its confidential product development."

Given this record, the judge was within her discretion to find by a preponderance of the evidence that Gillette's complaint lacked a reasonable factual basis. In making her determination, the judge did not, as Gillette argues, ignore the allegations in the complaint. The judge recited the allegations but concluded that they added little to the analysis because the complaint was "unverified" and "bare-bones" and many of the allegations were made "on information and belief." We agree with that characterization. Even read liberally, the complaint contains only conclusory allegations that the individual defendants misappropriated confidential information relating to the generic concepts of magnetic attachments and elastomeric pivots in razors -- concepts that Gillette conceded were in the public domain before the individual defendants started working at ShaveLogic. Gillette offered no evidence disputing the individual defendants' assertions that they did not work on any projects at Gillette involving the specific shaving technologies that are covered by the '282 patent and ShaveLogic's patent applications. Contrary to Gillette's representations, nothing in the Lipchitz declaration establishes a "clear connection," or any connection at all for that matter, between ShaveLogic's product and the work that the individual defendants performed at

Gillette. Thus, in light of the uncontradicted evidence submitted by ShaveLogic, the judge did not abuse her discretion in finding that, on this record, there was no reasonable factual support for Gillette's claims. See Van Liew, 474 Mass. at 40 (affirming denial of defendant's special motion to dismiss where "[i]t was clear from the text of [defendant's] complaint" in prior action that there was "no valid basis" for relief requested in that complaint). Cf. Benoit v. Frederickson, 454 Mass. 148, 154 n.7 (2009) (determining that petitioning activities had reasonable factual support where moving parties provided "evidence that, if believed, would support a finding in [their] favor").

The judge also could have found on this record that ShaveLogic proved by a preponderance of the evidence that it incurred "actual injury" as a result of Gillette's petitioning activity. G. L. c. 231 § 59H. As alleged in the counterclaims, Gillette's lawsuit and prelitigation letters have caused ShaveLogic to lose potential investors and marketing and distribution partners. Furthermore, Wilson's declaration states that in 2014 ShaveLogic was in negotiations with a nationally known shaving company for the potential acquisition of ShaveLogic, but those discussions fell through late that year because of this litigation. The judge could permissibly conclude that this was sufficient, at this stage of the

litigation, to establish actual injury and that the counterclaims could therefore go forward.  See Vittands v. Sudduth, 49 Mass. App. Ct. 401, 415 (2000) (nonmoving party met burden of proving actual injury through affidavits showing "that she suffered both financial and personal injuries due to the [petitioning activities]").

2.  Litigation privilege.  The litigation privilege generally precludes civil liability based on "statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding," as well as statements "preliminary to litigation" that relate to the contemplated proceeding.  Sriberg v. Raymond, 370 Mass. 105, 108-109 (1976). If the privilege attaches, its protections are absolute.  See Correllas v. Viveiros, 410 Mass. 314, 320 (1991).  Thus, a denial of a motion to dismiss predicated on litigation privilege can be immediately appealed under the doctrine of present execution.  See Visnick v. Caulfield, 73 Mass. App. Ct. 809, 811 n.4 (2009).  Our review on appeal is de novo, "accepting as 'true the factual allegations in the plaintiff['s] complaint [here, the counterclaims] as well as any favorable inferences reasonably drawn from them.'"  NES Rentals v. Maine Drilling & Blasting, Inc., 465 Mass. 856, 860 (2013), quoting from Ginther v. Commissioner of Ins., 427 Mass. 319, 322 (1988).  See Fisher v. Lint, 69 Mass. App. Ct. 360, 363 (2007).

According to Gillette, to determine whether the privilege applies in this case, we need only conduct a straightforward inquiry into whether ShaveLogic's counterclaims challenge acts taken in furtherance of litigation.  Utilizing that standard, Gillette contends that the counterclaims fall within the privilege because they are indisputably based on the letters that Gillette's counsel sent in contemplation of litigation and on the complaint itself.  The motion judge took a more nuanced approach, however, characterizing the counterclaims as challenging "conduct" -- namely, the "conduct of filing (and threatening to file) a baseless lawsuit" -- and not "statements" or "communications."  In the judge's view, ShaveLogic was complaining "not about defamatory remarks" but "more about abuse of process -- a claim plainly not subject to dismissal on the grounds of any privilege."  This distinction between speech and conduct is the focus of the parties' arguments on appeal.

We think that the distinction is a sound one.  At its core the litigation privilege is intended to protect participants in judicial proceedings from actions for defamation based on "statements" they made preliminary to or during the proceedings. Sriberg, 370 Mass. at 108-109.  See Aborn v. Lipson, 357 Mass. 71, 72-73 (1970); Correllas, 410 Mass. at 319-320; Giuffrida v. High Country Investor, Inc., 73 Mass. App. Ct. 225, 242 (2008). The privilege has its origins in two policy considerations, both

concerned with giving litigants the freedom to speak freely in order to promote the interests of justice. First, "an absolute privilege is favored because any final judgment may depend largely on the testimony of [a] party or witness, and full disclosure, in the interests of justice, should not be hampered by fear of an action for defamation." Correllas, 410 Mass. at 320. See Aborn, 357 Mass. at 72; Restatement (Second) of Torts, § 588 (1977). Second, the privilege furthers "[t]he public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Sriberg, 370 Mass. at 108. See Mack v. Wells Fargo Bank, N.A., 88 Mass. App. Ct. 664, 667-668 (2015); Restatement (Second) of Torts § 586.

In this case ShaveLogic is not claiming that the statements in Gillette's complaint or prelitigation letters are defamatory or otherwise actionable in and of themselves. Rather, the statements are evidence that might support ShaveLogic's claims of other misconduct, i.e., Gillette's purported acts of sending letters threatening a baseless lawsuit with the knowledge that ShaveLogic would have to disclose them to potential partners and investors, and then actually filing a baseless lawsuit, all as a means to prevent ShaveLogic from competing in the wet-shaving market. It is this conduct, and not any particular statements in Gillette's letters and complaint, that is alleged to have

interfered with ShaveLogic's business relationships and to constitute unfair and deceptive acts and practices under G. L. c. 93A. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273-275, 277 (1991) (holding that filing of groundless lawsuit can support claims for intentional interference with contractual relations and for violation of G. L. c. 93A).

We conclude that the privilege does not attach in these circumstances, where it is not the statements themselves that are said to be actionable. See 58 Swansea Mall Drive, LLC vs. Gator Swansea Property, LLC, U.S. Dist. Ct. No. 15-13538, slip op. at 3 (D. Mass. Oct. 12, 2016) (interpreting Massachusetts litigation privilege to apply to claims seeking to "hold[] a speaker liable for the content of her speech" but not to claims "using that speech as evidence of her misconduct"). Indeed, without this distinction, it is hard to see how any claim for abuse of process or malicious prosecution would survive an assertion of the privilege. Gillette's overly expansive view of the privilege would eviscerate these longstanding causes of action. See Beecy v. Pucciarelli, 387 Mass. 589, 593-596 (1982) (explaining elements of both causes of action).

It is true, as Gillette points out, that the privilege applies "to civil liability generally," not just to claims for defamation. Mack, 88 Mass. App. Ct. at 667, quoting from Bartle

v. Berry, 80 Mass. App. Ct. 372, 378 (2011).  Contrary to Gillette's suggestion, however, "civil liability" does not mean any and all claims related to matters of litigation.  A nondefamation claim can be barred by the privilege, but only if, like a defamation claim, it seeks to hold a speaker liable for the content of "statements" made in contemplation of or during litigation.  Correllas, 410 Mass. at 324.  If it does, and "the statements . . . were made in circumstances rendering them absolutely privileged," then the privilege attaches regardless of the underlying theory of liability.  Ibid.  This makes sense because "[a] privilege [that] protect[s] an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort."  Ibid.  But it does not follow that the privilege should further extend to claims that allege conduct, not speech, as the basis for liability.  To the contrary, such an extension would unmoor the privilege from its original purpose -- to shield individuals from defamation claims based on testimony given during a judicial proceeding.  See Aborn, 357 Mass. at 72.

We end with the acknowledgment that there are circumstances where the privilege may not apply even to claims that are based on speech.  For instance, the cases make clear that statements preliminary to litigation are only privileged if they "relate[] to a proceeding [that] is contemplated in good faith and [that]

is under serious consideration." Sriberg, 370 Mass. at 109.

Accord Visnick, 73 Mass. App. Ct. at 813; Mack, 88 Mass. App.

Ct. at 667.  See Correllas, 410 Mass. at 320-324.  If the

proceeding is not contemplated in good faith, the privilege

cannot be "employed as a shield of immunity for defamation" or

other liability.  Sriberg, 370 Mass. at 109.  Conversely, if the

proceeding itself is in good faith, statements pertaining to it

are absolutely privileged "even if uttered with malice or in bad

faith."  Correllas, 410 Mass. at 319.  We note these principles

but need not explore their precise contours here because, as

explained, ShaveLogic's counterclaims arise out of conduct, not

speech.  For this reason alone, the privilege has no application

to this case.

Conclusion.  For the above reasons, we affirm the portions

of the judge's order denying Gillette's motion to dismiss the

counterclaims under G. L. c. 231, § 59H, and under the

litigation privilege.[8]

So ordered.

---

[8] We deny ShaveLogic's request for appellate attorney's
fees.